The next case is Coyne Center v. Secretary, U.S. Department of the Treasury. Jeffrey Hetzel is here for the appellants. Bradley Henshelwood is here for the appellees. And Mr. Hetzel, you may begin when you're ready. Thank you, Your Honor, and may it please the Court. The statute at issue in this case lets OFAC ban transactions involving, quote, property in which a foreign country or national thereof has any interest. The easiest way to resolve this case is to hold that in our plaintiff's transactions, there is no foreign property. The district court had to erase the word property from the statute. The government on appeal says that the software published at the ban addresses as property, but the software is a non-proprietary lines of code that anyone on the planet can own or control or alter in any way. That is why after we sued, Treasury went to Congress to ask it to take out the property requirement. Even assuming that OFAC satisfies the property requirement, the designated foreigners have no qualifying interest. The district court said that foreigners have an interest in anything that gives them, quote, indirect benefits. The foreign born founders, the Russian born founders, are you telling me they have no financial interest in the increased use of tornado cash as service? Exactly, Judge Wilson. An interest in property has always meant a legal or equitable right. They don't have any interest whatsoever? Correct. What's going on when our plaintiffs use this software? Our plaintiffs are Americans. They own their cryptocurrency 100%. They put it in the software. This software can't be controlled by those foreigners. They invented it five years ago. They can't control it anymore. Our American plaintiffs don't pay them a penny, and then our plaintiffs get the cryptocurrency right back. It is a purely American transaction. There is no property involved first. The software is not property. But even if they were, there is no interest, as that term has always been understood in the law, that the foreigners have in our plaintiffs' transactions. Let me ask you to address this hypothetical for me. So let's assume, you know, like the Bank of Russia, the National Bank of Russia or whatever, has a free checking account that you can get, and so Americans get free checking accounts with the National Bank of Russia. Could the government ban that activity and say you're not allowed to get a free checking account with the National Bank of Russia? I think so, because the way that bank accounts work is that the Russian bank has possession over your property when you put your money in it. Here, the Russian inventor of this technology five years ago has no— I think that's the right answer because I think it has to be the right answer, but I'm trying to figure out how that works with respect to what you are arguing here because wouldn't it be the same that it's an American just transacting its own property back and forth and the foreign entity has no control over it, no property interest in it? Right, so, Your Honor, here they say that their only argument as to what could be the property here is the software. In your example, the money in the account is the property. Money is obviously property and Russia would have an interest in that property because it would have possession of that property. It is in the Russian bank's account. Here, the only property is the software. That's their only argument. They can't make any new arguments as to what constitutes the property. The reason they don't say the crypto is foreign property is because there is no possession by the foreigner of the crypto, but their only argument as to what is the property here is the software itself, which is just these lines of code published to the Internet that anyone can own or control. And so that's why they lose on the property element. Then just quickly on the interest element, the district court basically said that anything that creates indirect benefits for foreigners constitutes an interest in property. That doesn't have any support in the law as we were talking about, but it also would have remarkable consequences because, you know, it would allow OFAC to ban all cryptocurrency. It would allow them to ban all email, the entire Internet, and many other technologies because technologies all around us can be used by foreigners, generate indirect benefits to foreigners, and were created or promoted by foreigners. Just to follow up on Judge Wilson's question, I tend to agree with you that the district court's theory is too far, but it seems like if you have the torn token, you might have some beneficial interest in these accounts because you have some ability to control them. You have some sort of, you know, maybe it's not a financial interest in the same way a stockholder has direct financial interest in a company, but that you have some degree of interest in the account. Could you just address that? Like so I'm not talking about it's going to make it go up or down in price value, but just like they have some control over it, right? No, Judge Brasher. So the torn token, our plaintiffs do not own the torn token. Foreigners do. That's our government's argument. Right. And so the payments to the torn token that can happen through the software tool are banned under our requested relief. So they will be impossible under our requested relief. In order to make a payment, it's not even a payment to a torn token. It's a payment to a registered relayer and then like less than half the time, a tiny percentage. Yeah, I get that. I guess my point is for these accounts, the addresses that you're looking to sort of unlock as it were, don't the owners of the torn tokens have some kind of voting interest in the control of this system of which these addresses are a part? Absolutely not. They have no control over any of the addresses that we challenge. They do have voting power in this DAO, which is just the name for everyone who owns a torn token. The DAO has control over the addresses that we do not challenge. It has zero control over any of the addresses that we challenge. And this is just a factual question that I've tried to figure out. How is that? How do they have no control over the addresses? And I guess they used to control these addresses, right? I'm right about that. The original software developers had control over the addresses from 2019 until early 2020, and then they made them permanently immutable in early 2020. Right. And how do you – I guess – I mean, so they used to have control over them. They've made them where they don't have control over them. Why can't they make it where they have control of them again? So the technical answer to that is advanced math that I don't understand. Me too. The best explanation of this is Exhibit 62 in the administrative record. It's Document 68-1 starting at 153. It goes through the technicalities on kind of how it is. I think it's the default that when you publish these software tools to Ethereum addresses, they are immutable, and everyone agrees that there's kind of these mathematical steps you can take that make it so it's impossible not only for the creators but for anyone to ever alter them. And that's undisputed. That's in the administrative record. It's impossible for the foreigners to ever alter these. Okay. Well, I guess, you know, just – I mean, looking at the administrative record, there isn't any evidence in this administrative record, is there, that they've been able to – Tornado Cash has been able to stop its users from laundering funds for malicious cyber activities, given the history that the mixing service has been used for. There's no evidence of that in this record, is there? So, Your Honor, the record, the government has, I think, identified three times in the history of the service where North Korea had money that they stole and then they put it through the service. Hundreds of million dollars in stolen currency to fund North Korea's weapons and missile programs. So when you look at the administrative record, there isn't any evidence in there that the users of Tornado Cash are able to stop these actors from doing this in the future. So no one can stop these actors from doing this in the future. They're actually still doing it after the ban because the software is immutable. It's online for anyone to use. But this case is about whether OFAC can put our plaintiffs in prison for using their own property in a way that doesn't involve North Korea at all. Right. This isn't a ban on North Korea doing anything. It's a ban on Americans doing anything. Exactly, Your Honor. So, you know, our plaintiffs, you know, are using crypto. They're American plaintiffs. They're using crypto that's theirs. They're putting it in and out of the software, and they have nothing to do with these transactions with North Korea. And North Korea is, I mean, I think there was a Reuters article this spring. North Korea is still using this because no one can actually take down the software. They're just telling Americans, if you use the software for, and our Americans use it because, like, Patrick O'Sullivan, one of our plaintiffs, he gets paid in crypto. The way that crypto works, his employer could see every one of his transactions, and people who interact with his employer could. So he needs privacy. This tool allows him to have privacy so that his employer can't see everything he ever does. John Doe is using it for protection in his charitable donations. Our other plaintiffs have public addresses, and the public would be able to see everything they do. So these are Americans who just want privacy in their lawful activities, and OFAC's ban means that they would go to prison for 20 years for doing that. Isn't there an escape mechanism to avoid any criminal liability? All you have to do is to apply for a license in advance for a transaction that you want to conduct? So, Your Honor, I think the short answer to that is that when OFAC exceeds its statutory authority, we don't have to apply for a license. We could have applied for a license, and then when they denied it, brought the same case up. It would have just taken longer. But the point here is that OFAC doesn't have the statutory authority in the first place to ban this. We as Americans have the right to engage in these transactions, and so we have to apply for a license when they're within their authority, and we want a discretionary exception. They have no discretion to ban us from doing something that Congress did not authorize them to ban in the first place. Can I ask you a question about property, just to go back to your first point? So, when you look up kind of the definition of property, it's susceptible of being owned, is the definition of property, right? No one has to own it, but it's susceptible of being owned. Given that these token holders owned the addresses until 2020, why aren't the addresses susceptible to being owned, even if they're not owned now? So, I think the short answer is that under the statute, it has to be the foreigner's property. And so, you know, even if it was property, it wouldn't be the foreigner's property if they stopped owning it five years ago. But more— But, I mean, I thought you conceded that there are foreigners who own the torn tokens that then give them a beneficial interest. Yeah, sorry, Your Honor. I thought those were the—I just—I mean, maybe I'm wrong, but I thought those were the foreigners that were supposed to do the owning. Right, so they can't—they don't own the software anymore. And the reason is because it's no longer capable of being owned because you're no longer capable of— See, that seems to go to—and I don't mean to nitpick you, but that seems to go to the interest issue and not the is this property. It seems like you're saying, well, it is property, maybe a theoretical sense, but just there's no one—there's no foreigner that really owns an interest in it. It's like property, like, you know, if you, like, throw a baseball and it just floats in the ocean, it's still conceivably property, but just no one has an interest in it. Is that kind of what you're saying? So, Judge Breyer, I agree you can think of this— I think it kind of works either way in the interest category or the property category. I would say that their argument as the property is not the one you're making. And so, you know, they're stuck with their argument based on channery and basic rules of forfeiture and waiver. Their argument with—as respect to property is just that the software is property. And they don't even make an argument that it satisfies that definition that you just gave. I see my time has expired. All right, thank you. Counsel, Mr. Herzl? Good morning, Your Honors. May it please the Court, Brett Hinchwood for the government. I think it's useful to step back and think about what the Tornado Cash sort of entity has created here, which is a cryptocurrency mixing service that North Korea and other actors use to launder stolen cryptocurrency. And it provides that service using a variety of smart contracts. And it makes—you know, just in the same way that a bank might use software to provide banking services. And it charges the public for some uses of that service, of that mixing service, but not for other uses of that mixing service. And so the plaintiffs here aren't disputing that, you know, when someone uses the service and pays Tornado Cash a fee, that's, you know, something that can probably be blocked. So the only question is whether when the plaintiffs are making sort of non-fee uses of the service, that that—whether there's still an interest in those transactions. And there absolutely is, partially because the service itself works better. The efficacy of the service, as Tornado Cash itself repeatedly explained, depends on the number of people using the service as a whole. So the more people who are putting cryptocurrency into these pools and taking money out of these pools, the more effective the mixing service is going to be. That's why Tornado Cash sort of encouraged users over time, promoted the service repeatedly, continued to develop the service, and add additional features to the service. And it's also why Torn confers the kind of interest akin to the way a stockholder would look at, you know, the success of a company's service and the uptake of a company's service as central to the value that the stock of a company would have. The uses of the service are central to the way that the value of Torn is related and gives them the kind of interest that can be blocked under the statute. Yeah, so I think you're right that the nub of this dispute between you and the other side is how we look at this. Do we look at it as like an overall service, or do we look at these specific addresses? And their argument is that, look, you banned specific addresses, right? In your regulation, you say you can't use these specific addresses. So why can't we look at—why don't we have to look at, okay, you banned this address, which I don't even know what that means, by the way, but you banned a specific address. Why don't we have to look at, okay, does that specific address involve property? Does it involve property that a foreigner has an interest in? Why don't we have to look at it that way? Well, I mean, again, I think there's a whole list of addresses, which basically just is describing the specific components that make up the Tornado Cash service as a whole. And, you know, they have focused on some particular pieces of the service, which, you know, you sort of would interact with different pieces of it, depending on exactly how you're intending to use the service in a particular instance. But I think we still step back and look at the service as a whole, in part because, I mean, as the agency has recognized for a long time, property includes services of any nature whatsoever, in addition to contracts of any nature whatsoever. And plaintiffs don't dispute that services of that type are property. In the same way we wouldn't, I think, in the bank example that you were discussing with my colleague earlier, sit down and try to figure out, okay, well, in this specific bank transaction, the Bank of Russia gives me a free checking account. Well, what if they promise not to block any of my transactions? What if the money just sits there and they promise not to do anything to it? Well, then we don't sit around and parse at that level exactly what's going on, particularly whereas here the whole point is to encourage people to use the service to make it more effective for the paid customers and for all the transactions. I mean, that's why the service is as effective as it is. And so, you know, the interest that's derived, the benefit that's derived from continued uses of the service, repeated uses of the service, even unpaid uses of the service, is I think pretty clear just from the nature of the particular conduct at issue here. So what about the malicious cyber actors who use this mixing service to launder hundreds of million dollars in stolen currency and to fund missiles and weapons programs in South Korea? He says they're gone now, and these are just legitimate Americans, and that's supported by the administrative record. What's your response to that? Yeah, I mean, there's nothing in the administrative record about who's currently using the Tornado Cash Service. I mean, the nature of any OFAC sanction is that it can only reach persons over which the United States has jurisdiction. So, of course, when we sanction a Russian bank or an Iranian bank, people in Iran can keep using that bank. I mean, there's nothing we can do to stop that. But it doesn't mean that we lose statutory authority just because some people may still be able to use a particular bank or service or whatever. So the fact that maybe some malicious actors still get to use it doesn't change the authority. And, in fact, I mean, as we were just discussing, because volume of use is central to the way that this operates, I mean, if you look at pages 51 to 54 of Document 68-1, the agency laid out in great detail, quoting Tornado Cash itself, about how important it is to have lots of people use the service, have a high volume of transactions in order to make the service work. And, you know, the fact that, you know, I think it's reasonable to conclude, and not that it's necessary under the statute, but it's reasonable to conclude that if fewer people are using the service, it's going to be less effective. That's the whole point. And it's also going to affect, you know, the interests that these foreign nationals have. Do you agree with, and so he cited Exhibit 62 in the administrative record and says, look, that establishes that these specific addresses are immutable and can't be changed and are outside the control of any foreigner. What about that? I haven't looked specifically at Exhibit 62, but, I mean, I will say as a general matter, we're not disputing for present purposes that with some of the specific addresses they've identified, it's not at this time possible for them to edit the specific terms of those particular contracts. But I think, again, if you're looking at, I mean, as you were discussing with him earlier, I mean, the point is these are contracts they created that they put out into the world. The fact that they told people, okay, we'll stop changing those while we keep developing the service in other ways and adding additional features, adding a new network, you know, adding what they called Tornado Cash Nova, which enabled different types of different amounts of transactions. I'm happy to discuss all these details. Let me ask you just one additional thing on this issue. So there are these specific addresses that they've identified and said they're immutable and they don't generate fees. Just in the way that this works, could I, as a holder of TORN and my group, could I say, look, stop using those addresses. We're just going to create, we're going to, like, replicate this code over here and just create a new thing that has the same effect. And that generates a fee. You see what I'm saying? Like, could they replicate those addresses and effectively not close them down but sort of do, like, a 2.0 update, a better address to use? I think that is something they could do. They could deploy, write and deploy new smart contracts. That's something that they do all the time with respect to other features of the service, as I was just mentioning. And, again, because the effectiveness of the service depends on people using it, if you sort of shift people to a new contract, to a new, you know, component of the service, then those old components are going to become less useful and eventually just irrelevant because no one's using them. So, you know, even if some specific contract, some piece of this can't be changed or updated, it's not like they can't continue to develop and, you know, refine and improve the service over time, which is exactly what they were doing. And in the same way, you know, someone else could, you know, create some different service using a similar mechanism and they could choose to, you know, not make promises about not changing some pieces of the service or whatever. I mean, there's any number of things that could happen. But in this specific instance, what you've got is, you know, a world in which, I mean, the administrative record indicates 84% of the withdrawal transactions from the train-of-cash service are using the relayers. So the vast, vast majority of withdrawals are ultimately using this paid service. And, you know, the additional sort of unpaid uses are there to just sort of help add volume, you know, to the service at that point. Let's go back to the language of the statute because I thought I understood the case and now I'm confused. Property in which a foreigner has an interest. What is the property? So the agency explained that the property is the tornado cash service, which is— So you're saying it's the whole service. Yes, which it includes, which is made up of smart contracts. It includes the addresses, the smart contracts, the whole mixing service, everything. Correct. You're saying that's the property. Yes, and I think if you look at pages 14 to 16— And how do you show they have an interest in that? So their interest— If there's no fees being paid for the use of all those services. Right. So, I mean, you're setting aside the ones— Actually, let me step back. Who is the foreigner? Which foreigner? Is that the three Russian developers? It's the Russian developers and members of the DAO, the D-A-O. Okay. Some of them are foreigners as well. Okay. So we know who the foreigner is, and the property is the service as a whole. That's right. The whole system. Yes, and that's what the district court said repeatedly. If you look at pages 14 to 16 of its opinion, when it's rejecting, you know, plaintiff's arguments here, it says, look, they have an interest in the service as a whole because the efficacy of the service, you know, is improved by people using it and because ultimately—and I think you're about to get to this. But who owns the service? Tornado cash owns the service. Who owns Tornado Cash? The founders, developers, DAO, DAO, that organization.  So— All the members of the DAO, the DAO, are they all foreigners? They're not all, but they're not required to all be foreigners. And no one here is just— I didn't say they were. I just asked. There's no evidence that they all are. Okay, but there's evidence some are. Correct. And then on to the interest, which I think was the last component you were anticipating too much. The—I mean, the interest here is not just the relayer payments, but also with respect to these transactions that, you know, don't involve fee payments. The fact that TORN is essentially stock in a corporation and the value of TORN is going to be correlated to the success of the service, the uptake of the service. The stock and corporation analogy doesn't help me with this. This is much more amorphous than all that. I understand. I think the—obviously the technology component of this is somewhat complicated, but I do think at bottom— Oh, that's not what it is. It's got many different pieces and parts that make up the whole service, let's say. Well, sure. I mean, I guess the way the stock— Most of it doesn't generate a fee. And some of the fees that are generated go to people who aren't in the DAO. Well, again, most of it does generate a fee. I mean, 84% of withdrawals generate a fee. So most of it does, the withdrawal transactions. Because remember, putting the money in the pool is only so useful. You've got to get it out eventually. And the point where the payment happens is at the withdrawal stage, and that's, you know, I think it's 83.67% of transactions. Who are the relayers? I mean, those are other individuals who, you know, sort of sign up to be relayers and participate in the system. But, you know, we— Are they foreign nationals or we don't know? I don't know that there's anything specific in the record about that. But who they are? We're not specifically dealing— But that's where the fee goes. They're paying a fee to Tornado Cash. I mean, Tornado Cash is getting it. And I think this is where actually it's helpful to go back to TORN as an analogy to stock. And let me try to explain why I think it works well, which is when you think about stock, as a shareholder in a company, you can expect a few things. You usually have some sort of voting rights. You usually have some sort of share in distributions like dividends. And you might expect that you can sell your stock on a stock exchange to other people. All three of those things are essentially true of TORN. So TORN gives you the right to vote on changes to the service by participating in the DAO, the D-A-O. It also gives you a share of those relayer fees, essentially like a dividend. You can get—you're entitled to a share of those fees if you like them. And then also you can sell it on a secondary market just like stock. So, I mean, I think that's why that analogy has always been an effective one and an important one, one something the agency was focused on for exactly those reasons. So the bottom line, as I understand your argument, is that the founders, the foreign nationals still have an interest, even though it may be remote in the mixing service, right? Yeah. I mean, I wouldn't characterize it as remote. I mean, I think if I'm a stockholder, I want the company I own stock in to do well. But, yes, I mean, they still have an interest in the service as a whole, even if you're not paying them a fee every time you use it, in the same way that if a company gives out some of its product for free or allows you to use its service for free. And that was primarily the basis for the blacking order. Is that right? I'm sorry, what was primarily the basis? Their interest, the foreign nationals' interest in the mixing service. Yes, absolutely. Okay. So, just to go back to Judge Hull's question. So, just walk us through the statute. The property, under your view, is the mixing service itself in its entirety, right? Yes. Okay. And then the interest in the property is, well, the foreign interest in the property, is the fact that foreigners own torn tokens that give them some control and some expectation of profit from the mixing service's success or failure. Correct. And that takes multiple forms, as we've sort of discussed. It can be fees. It can be just the value of the stock itself, et cetera. Yes. So, but if we break it down, and this is why I think this is really the dispute here, if we look just at these specific addresses and we don't look at the mixing service as a whole, what is the property then? I guess my question to you is, do you lose if we look at the specific addresses that they are challenging, or do you have an argument with respect to the specific addresses and not just the mixing service as a whole? Yes. So, we also think that the specific addresses themselves are property, for actually a lot of the reasons you were discussing with my colleague earlier, namely that these things, although they are not currently mutable or changeable at this exact moment, are in fact something that was created and there was a conscious decision made to put it out there. It doesn't mean it's no longer property at that point. Now, we haven't litigated that question in this particular appeal in any great depth, in part because the district court recognized, as we've been discussing, that this was the service as a whole is what was at issue, and also because plaintiffs themselves haven't really made an argument, as far as I can tell, that this isn't a service. I mean, you look at page 12 of their reply brief, they have one sentence that says, well, this isn't a service because no one's actually performing labor, and I think that's the only argument they've advanced, really, that this isn't a service. But, I mean, that can't be correct. I mean, in the same way that the bank is giving you banking services if you do online banking, even if no teller is going and writing down the changes in your account, I don't think there's any difference there. But, I mean, to your point, I mean, we do think that, yes, there is, you know, additionally this. Okay, so then what's the, so then if the addresses, which are immutable, if they are a kind of property, what is the foreigner's interest in that property? It's the same interest as before. I mean, it's either the interest in receiving the relayer payment. Well, but that's, see, I thought that these addresses don't provide the relayer payments. So these, when you do the transaction, let's take a relayer transaction for a moment. When you are doing the withdrawal transaction, you're triggering multiple different contracts, some of which run the relayer sort of features of the service, and some of which do the basic withdrawal. There's a lot of different contracts that are being triggered. So you can't do the relayer contract, the relayer payments, without also triggering these contracts. And when you do these, you have, you know, these, I think the reason planners call them the core services, or the core contracts, whatever the term is, is that you have to use these for all the transactions. Right, but I guess what the planners are saying is that you have to use these, but you don't necessarily have to use the relayer services. So they're conceding that you can continue to block those addresses. And that's where you get to the point that even for these uses, where you're not triggering the relayer components of the service, you're still, you know, making use of the service, and you're still making use of these particular contracts that are part of the service, and that there's still the same interest. And I'm sorry, I recognize the height of the premise of your question, just taking the service and stopping it. So let me back up. You're still, at that point, the interest remains the fact that the uses of those contracts are going to accrue to the benefit of the torn holders by making, you know, other contracts work more effectively. The fact that you're giving it away for free in one particular instance doesn't change the basic nature of the interest. So that's kind of your network effect argument. That's what you're saying, that you need a lot of people using these contracts in order to mix the transactions together. And so even if you're giving away this for free, your service as a whole really can't work unless you have a certain amount of churn in it. That's what you're saying? Exactly. In the same way that, you know, if it was, you know, a Russian bank, just to take it back to an example that is a little more accessible, right? The Russian bank may want lots of people to be doing transactions so that they can hide money more effectively, and they may give it away for free. They may say, you're free checking, and we promise not to touch it, and whatever. It doesn't change the fact that you can't use their services and that the particular transaction still implicates the bank's interest with an interest of foreign nations. I think it's very hard to come up with any analogy because it's so complicated. That really works here. That's why understanding how it actually works and where is the property and where the interest is, and I'm still not getting it because you just said 16% of these don't have any fee. And so the property there is just because more people use it, it makes it better for everybody. I mean, you're still using it. I mean, the Dow, you said 84% of them had relay contracts, and they get some money and you're saying some small part of that goes back to the Dow? Correct. Okay. And so the Dow is all the people who own the tokens. There's a step in there, but yes. I mean, they have voting rights over how this all works. Correct. Can you find out who is in the Dow or is it all anonymous or at least a lot of it anonymous because of the addresses that you can't really? Do you show the owners of the Dow these addresses or how do you determine who's in the Dow? I believe it's possible to identify specific wallet addresses that hold. Wallet addresses. And that's where everybody puts their money, in the wallet accounts. But can you tell who those people are? It depends on if you know who owns that particular account. No, but if you don't know anything outside of the service, you can't know whether they're foreigners or Americans. I mean, Americans, the clients here had some wallets, I assume. Right? Is that right? They must have had some wallet accounts. They had wallets. They don't claim to have owned TORN, so I think it's a different situation. I guess, let me back up. They don't claim to own tokens or they don't claim to own, what is it? So my understanding is that they own Ethereum, which is the cryptocurrency. The blockchain. Sorry, the cryptocurrency of the Ethereum blockchain and not TORN, which is the stock. They don't claim to own the stock in Trinocash. What we do know, and the agency explains this. They just want to use the mixing service. They use the service. That's all they use. All right. So they're not really owning. They don't own the TORN. Okay. Forget about them. Let's go back to who's being blocked here. Okay. Which is the DAO. Okay. And the DAO's mixing service. The DAO and the Russian National Founders and Developers together make up the unit. That's correct. And they develop the mixing service. Correct. And all these addresses and how you exchange them and mix them together so you can't tell who anybody is. Correct. Okay. And the people that use the mixing services get some fee if they use a relayer. So the DAO.  Right. Well, get some fee from the relayer. Correct. And can you tell us the relayer just addresses to? I mean, all of this is done on the blockchain. All of it. Yeah, yeah. So it's all done within the blockchain. Yeah, that's just all. And it's all encrypted. So. So you can't tell who anybody is. Well, you may know from other things. I'm not talking about how you know. I'm talking about if you were to look at it and you were to participate in it, you really can't know. I mean. That's the whole purpose of it. Well, I mean, this gets to why the relayer system exists, which is the relayer system adds additional anonymity. And I'm happy to get into all that. But, you know, it's not like your name is written on your account. So let me put it that way. So there is some degree of anonymity out there. No matter what, without even the mixing service. Correct. But it is possible to trace how transactions, how money moves from one account to another. Because every transaction on the blockchain is public. So anyone can see that, you know, money moves from this account. I got that part. That's easy. Okay. So I'm just trying to say the property is the mixing service, not the whole tornado cash thing is what you're saying. Because the whole tornado cash thing doesn't generate any fee except from the relayer. Is that the only fee that gets the money that goes to the DAO? I think maybe this is getting to some terminology, which is tornado cash is sort of used to refer to two things. Yes. In the same way we might call Facebook the company and Facebook the service,  There's tornado cash sort of the company, the entity. And there's tornado cash the service. Yeah, I'm talking about the service. Okay. So with respect to the service, that is the service. The only fees come from the relayer. The only direct payment fees are, yes, from relayer-aided transactions when they're taking money out of those pools. And those fees go to the relayer, but they also, some of it goes to the DAO. Paying a fee to the tornado cash itself, yes. Okay. Thank you. All right. Thank you, Mr. Hensherwood. And Mr. Hetzel, you've reserved some time for rebuttal. Thank you. Just three quick points, Your Honors. So first, I think it's clear now that as to our transactions, 0% of them use relayers, 0% give anything to the designated foreigners, 0% involve any control by the designated foreigners. That 84% number is for transactions not at issue here. I'll also say that the relayers were only added a few months before the ban happened. But the foreign nationals still have an interest in the mixing service. No, Your Honor. They have no interest at all in any of the transactions at issue in this lawsuit. That's not answering the question. Okay, we're not talking about your client's transaction, which I'm at the mixing service, I think, generically. I'm sorry, Judge Wilson. Maybe I'm wrong, but I think you're talking about they have an interest in the . . . I'm sorry. I may be remote, but when we look at how the Act has been interpreted, including by the Supreme Court in the Dames and Moore decision, the Act says that the President has this sweeping and unqualified authority. It's been interpreted very broadly to permit the Department of Treasury to block these transactions that affect national security. That's broad language. And so I guess I'm struggling with this. For me, I'm struggling with the substantial evidence standard of review. So, Judge Wilson, I think Dames and Moore actually explains how to answer this kind of fundamental problem of how should we think about the fact that some of these transactions that they banned, we don't challenge and do generate payments to the foreigners, and the ones that we do challenge do, and their move is to kind of clump them all together. Now, the text of AIPA makes clear that they can't do that because it asks whether the transaction itself involves foreigners' property interests, and Dames and Moore shows this court how to do that. In Dames and Moore, the executive action there banned a wide range of actions with respect to Iran. It banned transferring assets, transferring funds. In personam lawsuits, in rem lawsuits, attachments of property, judgment. The court was very careful in picking off the in personam lawsuits, carving them out and saying these actions go beyond the statute and saying the president has no authority under AIPA to ban these actions. And so the courts in all of these cases take a very careful approach. They don't clump it all together. In that, they said once the judgment happens, AIPA kicks in. Before the judgment happens, AIPA doesn't. So the courts do break this down in the way that the government is saying that this court shouldn't. And then just very briefly, two other points. They rely on their regulatory definition of property includes services. We don't think that it meets the plain meaning of that regulation, but the most important case here, post-Loper Wright, is Real v. Simon, an old Fifth Circuit case that we cite, that says that Treasury's regulations under this statute do not control when they're not consistent with the plain meaning of the statute. So they need to win under the plain meaning of the statute. They do not even argue that they do that. All right. We have your argument. Thank you, Mr. Hansel. Can I ask just one thing? If you were to write an injection, could you carve out, say, transactions that don't involve relayers or any fees? Yes, Your Honor. Because you're saying you don't use the relayers. You don't get into all of that. Yes, Judge Hall. If you were to say how you come outside, even if they could do all this, just everything else, is that what you're saying? Okay, we're not worried about all those transactions. We're just worried about how we use the service. Yes, Judge Hall. So you don't use relayers. Your clients just do it. They just use the mixing services themselves. Exactly. Okay. Under our requested relief, it will be impossible to use relayers because we don't challenge Address 31 listed in our appendix, which their administrative record, I think the key technical pages in their evidentiary memorandum on this are Document 68-1 at 55 through 59, in addition to the exhibit that we discussed earlier that explained how relayers work. They show that relayer transactions have to go through this address that's listed as 31 in our amended complaint. We do not challenge that address. It will absolutely remain a crime to use relayers after we win. Can I ask you a question about that to follow up on that? And this just goes to how this works. Is it possible for the government to enforce a ban on that address against U.S. citizens once the transaction goes through one of the other addresses? So given that the entire point of this is to obfuscate where the money is going, how would the government say you can't use Address 31 if you're a United States citizen if you can send the money through one of these other addresses? Right, Your Honor. So I think the answer is, first of all, they can still do the backtracing. So if you ever use that crypto in any way that reidentifies you, it's pretty easy, oh, that crypto went through the relayer address. Basically what this tool does is it just creates a break in your transaction history, but if they have anything on the after side of it, then they can still see that. There's also a compliance tool discussed in Exhibit 160 that can show how your crypto went in and out of the transaction and can selectively reveal to someone that you did not use a relayer. And so I think they do have the tools available to see if you use that tool. But more fundamentally, they don't have the statutory authority to ban it either way. So how much money is involved in your clients? I mean, it's all hypothetical virtual money, but, I mean, what is the value that we're talking about here? Can you put a value on it? I don't know whether that's possible. It varies by client. So Coin Center receives donations that can be sizable, can be very small individual donations. Patrick O'Sullivan, one of our plaintiffs, received some of his salary in crypto, and so that would just be the equivalent of what his salary would be in U.S. dollars. They just pay it in crypto. And so that's kind of the amounts that we're talking about. Okay. Thank you. Thank you, Mr. Hetzel.